J. N. ARNOLD, G. GOODRICH, and W. J. BARRON, for the Application.

D. MCILROY, District Attorney, R. S. BLACKWELL, and DAVIS and MARTIN, for the People.

---

HORACE NORTON *et al.*, Appellants, interpleaders in a suit between Jeremy Hixon, *v.* THE LEXINGTON FIRE, LIFE AND MARINE INSURANCE COMPANY, Appellee.

ERROR TO COOK COUNTY COURT OF COMMON PLEAS.

Upon a marine risk, the insured may claim as for a total loss, when the vessel is so much damaged by any of the perils insured against, that the damage or the cost of repairs is fifty per cent. of the value.

To recover as for a total technical loss, when the thing remains in specie, the owner must, within a reasonable time after he is informed of the disaster, formally abandon the thing insured, giving notice of the facts connected with it, and the condition of the property.

If this abandonment is accepted, the property then belongs to the insurer, and his liability is the same as if the property were destroyed. If not accepted, if the facts authorize an abandonment, the same consequences will follow. Subsequent events cannot defeat a right of recovery.

The facts existing at the time, must determine the right to abandon, and with a vessel, this right exists when the cost of restoring her in an equally good condition, exceeds fifty per cent. of the value. The owner must abandon before the repairs are made.

The right to abandon must be determined by the judgment of experts, applied to the condition of the vessel at the time of the abandonment; and, although the

Norton et al. *v.* The Lexington Fire, Life and Marine Ins. Co.

cost of saving and repairing the vessel after her abandonment may be less than fifty per cent., yet, if at the time, the facts apparently justified an abandonment, it will be good.

If the underwriter, after an abandonment, take possession of, and repair the vessel, and return her within a reasonable time, at a cost less than fifty per cent., the assured cannot refuse to receive her.

If after an abandonment, the underwriter takes possession of the vessel, although he do so under protest, and gets her off and repairs her, no matter at how small or great a cost, it is an acceptance of the abandonment, if he do not return her in a reasonable time.

If the underwriters retain the vessel for an unreasonable time, the insured is not bound to take her back.

Where a policy declares that the insured shall not have the right to abandon, until it shall be *ascertained* that the recovery and repairing of the vessel is impracticable, the court has the right to construe and explain the contract, and may instruct the jury so as to explain its true meaning.

The owners of a vessel are not bound to receive her from the underwriters, if, in the repairs, her capacity was materially lessened ; she must be made as good as she was before.

A prompt notice of the abandonment should be given, that the underwriters may save what they can of the vessel; but if the delay in giving notice does not work any injury to them, a greater delay in giving it may be excused.

It appears from the record, that on the application of Norton, Walter & Company, the schooner Buena Vista was insured to them for $4,000 by the Lexington Fire, Life and Marine Insurance Company. That on the 27th day of November, 1850, she, with a cargo of stone coal and pig iron, in a storm was wrecked near False Presque Isle, in Lake Huron, on an uninhabited coast, 150 miles or more through forest, to a settlement; with no means to be procured for getting her off ; at a season of the year when navigation was closed or nearly so ; the weather and water too cold to admit of working in it, and the vessel filled with water, and having on board a cargo which it was impossible to get out without facilities which were not within the reach of the master and crew. That on the 26th day of February, 1851, Norton, Walter & Company abandoned her to the underwriters, with the instrument copied into the opinion. It also appeared that the owners had notice of the wreck of the vessel about the first day of December, 1850. That the vessel lay in the condition in which she was left by the crew, without any effort to get her off, until the 26th day of June succeeding, when the Insurance Company sent a person to the wreck, who got the vessel off, passed with her through Lake St. Clair, by Port Huron, Detroit, and down the Detroit River, to Malden in Canada, and there repaired her. That she was not tendered to Norton, Walter & Company, until the succeeding August, and that in repairing her they had reduced her capacity. That Norton, Walter & Company refused to receive her when she was tendered to them, and alleged this fact as one of the reasons.

On the 13th day of October, 1851, Norton, Walter & Company, in the Cook county Court of Common Pleas, commenced

an action, by attachment, against the Insurance Company, on their policy, swearing to the abandonment and the indebtedness under the policy, and levied on the schooner "Buena Vista," as the property of the Insurance Company. At the November term of said court, a declaration was filed on said policy and abandonment, and at the succeeding March term, they took a default in said suit. Subsequently to the date of the attachment writ of Norton, Walter & Company, but returnable to the same term, Hixon, in the same court, commenced an attachment suit against the Insurance Company, on an accepted draft of said company, which was levied on the same vessel, filed his declaration and prosecuted his suit to charge the property. Afterwards, Norton, Walter & Company filed in the suit of Hixon, an interpleader, claiming the vessel, on which issue was joined, a trial had, and a verdict of the jury, that the property at the time of the levy, was the property of the Insurance Company. A motion was made by Norton, Walter & Company for a new trial, which was overruled, and the court at September term, 1853, J. M. WILSON, Judge, presiding, entered a judgment on the finding of the jury. Exceptions were taken by both parties to some of the instructions of the court, and Norton, Walter & Company have brought the case here for review. By stipulation, the cause was removed from the third to the second grand division for hearing and judgment.

GEORGE MANIERRE and E. S. WILLIAMS, for Appellants.

The vessel went ashore just before the close of navigation, in December, 1853; she was left by the crew in a stranded condition, on the shore of lake Huron, sheltered between two headlands; notice of her condition was immediately communicated, in December, to the owners by the master, but notice of abandonment was not given to the insurers until the month of February succeeding, a period of nearly three months after notice of her condition was received by the owners, and it is not pretended that they were waiting to receive further information before the notice was given, or that in fact any further knowledge was received down to that time. We contend, therefore, first, that the notice was given too late. BECAUSE:

1st POINT. The assured is not obliged to abandon even when he has the undoubted right so to do. Abandonment is not favored; it is a right *stricti juris*, and if notice of it is not given within a reasonable time after the receipt of information, the assured is presumed to have made his election not to abandon. 1 T. R. 614; 5 M. and S. 47; 12 Peters, 398; 3 Kent, 320. And in some of these cases a delay of even one day after

receipt of information, was held to be fatal to the exercise of the right. In this case, as we have seen, there was a delay of nearly three months. It is no answer to say that no injury has resulted to the insurers by the delay. Where notice is not given, the party is presumed to waive his right. 5 Martin (U. S.) 563.

2nd POINT. But, in the second place, we contend that the insurers had no right to abandon the vessel at all, when the notice was given. On this subject, the rule may be stated as follows:

A valid abandonment can only be made where at the time of the injury, the vessel is either a total or constructive total loss, or where there is a high probability of her becoming so. *The condition of the vessel at the time she is abandoned, is the test of the right,* and to justify an abandonment so as to charge the insurers where the loss is a constructive total only, it must be proved that she was in such a condition at the very time that no considerate owner would have attempted to get her off, or in such a state as rendered it highly probable that she would become a total loss. And if she is not, then the mere act of abandonment or notice to abandon, although given in time, will give no right whatever, as against the insurers. 20 Pick. 149; 7 Pick. 257; 1 Caine's Cases in Error, 39, 41, 42; 2 Sandf. 79, 482; 4 Dallas, 449; 3 Gill and John. 467; 3 Wash. C. C. 127; 4 B. Mon. 5.

Now, in this case, there is no evidence whatever, that the vessel was either a constructive total loss when she was abandoned, or that there was a high probability that she would become so. Consequently, if the notice had been given in time, viz: as soon as the assured were advised of her condition, in December, yet in the absence of proof, showing her actual or constructive total loss, or high probability of her becoming so, the assured must fail as against the company. Where is the evidence of these indispensable facts? It is not to be found in the circumstance that she was stranded. The mere fact that a vessel is stranded or submerged, is of itself no evidence that she is lost. She must be shown to have been in a condition of extreme peril, in which she would probably go to pieces. 3 Gill and John. 467-8; 7 Pick. 254; 11 Pick. 95. In this case there is not only no such evidence, but it is expressly shown that she went ashore between headlands, and was in fact afterwards repaired for less than half her value, which is evidence to show that she was not in extreme peril when she was abandoned.

3rd POINT. But it is urged, that though the vessel was not lost, yet that the voyage was lost, and that the right of aban-

DECEMBER TERM, 1854. 239

Norton et al. *v.* The Lexington Fire, Life and Marine Ins. Co.

donment may be exercised if the voyage is lost. But no such right exists for mere retardation or loss of voyage, because the insurance is not on the voyage. If there is no right to abandon as for a total loss of the vessel, then the right does not exist with respect to the voyage, though that should be lost. 12 Peters, 401; 5 S. and Rawle, 506.

The case then, so far, stands thus: A notice to abandon given three months *after the parties were advised of her condition*, and no proof whatever as showing that if the notice had been in time, the vessel was in a condition to justify the party in giving notice.

It is however, said, that the insurers accepted the abandonment by taking possession of the vessel and repairing her. According to the general maritime law, (except in Massachusetts, where a different rule prevails,) the insurer has no right to take possession for the purpose of making repairs; and if he does so, it is treated as an acceptance of the abandonment. This we concede. 3 Kent Com. 321; 4 B. Monj/5; 12 Peters, 400; 3 Mason, 49, 87.

But the distinction between these cases and the present, is, that by the express terms of the policy, it is expressly provided that the owners shall not have the right to abandon until it is ascertained that it is impracticable to repair her, and that the insurers should have the right to take possession for the purpose of making repairs, *and that this act should not be treated as an acceptance of the abandonment.* In making repairs, therefore, the company entered under authority contained in the policy.

4th POINT. But it is again contended that the vessel, although repaired for less than half her value, was not in fact as good as before, from which it is inferred that she was injured more than half her value by the perils insured against. The evidence on this point, is clear that she was substantially as good as before, though the knees which had been put in to strengthen her, somewhat impaired her capacity for carrying lumber. But we contend that the question is not whether she would carry as much of a particular kind of freight as before, but whether her tonnage for freight was substantially reduced so as to impair her value in the market for lake commerce. This does not depend upon the question whether as much lumber could be freighted in her. The evidence is clear that she was worth as much money as before. The plaintiff seems to think that if the capacity of the vessel for a particular kind of freight is reduced, that the right to return her does not exist, though she might in fact be worth more money in market. This is not the rule. 7 Pick. 254; 11 Pick. 95; 1 Conn. 239.

5th POINT. But it is finally contended that the insurers did

not take possession, make repairs, and return the vessel within a reasonable time after navigation opened in the spring. If this were the fact it would not be material, because when she was tendered to the owners, they did not object to receiving her on that account, but their objection was, that she would not carry as much lumber as before; not even that she was not of the same value for any other freight, or in market as before she was stranded. It is now too late for them to urge this objection. When a tender is made, a party is bound by the answer he makes at the time.

G. GOODRICH, for Hixon, Appellee.

FIRST. That Norton, Walter & Company by their abandonment, and subsequent attachment of the vessel, as the property of the insurance company are, as against Hixon, estopped from asserting property in themselves to the vessel. 1 Greenl. Ev. Secs. 207, 354; 6 Adol. and Ellis, 469; 4 Met. 382; 3 Hill, 215; 12 Pick. 307; 1 Scam. 148.

Second. The clause in the policy declaring, "that in no case whatever, shall the assured have the right to abandon until it shall be ascertained that the recovery and repair of said schooner is impracticable," is but declaratory of what the law is, without such a clause. It in no way differently affects the rights of the parties. 20 Ohio, 211; 7 John. 514; 2 Phillips on Ins. 249, 25; 4 Cranch, 377; 2 Arnould, 1085, 1086 and 1088, 194, 195.

Policies declaring "one-third new for old shall be deducted," are only declaratory of what the law is.

Third. A technical total loss may exist without a physical destruction of the vessel. When, to all human appearances, there is a high probability of a total destruction of the vessel, there is a technical total loss, and if while it continues, the vessel is abandoned, the insurer is liable as for a total loss. 3 Kent, 321, 318; 2 Phillips, 252, 253, 257 and 261; 22 Pick. 191; 12 Peters, 378; 6 Mass. 479; 3 Sumner, 228; 3 Mason, 27.

There is a total loss when she cannot be repaired at the place of disaster. Same authorities, and 1 Met. 160; 5 Peters, 619; 11 Peters, 99; 1 Mason, 341; Arnould, 1088.

Fourth. If the vessel is repaired by the insurers, it must be returned within a reasonable time. 2 Cranch, 530; 4 Dallas, 254; 7 Pick. 254; 6 Mass. 479; 1 Met. 160.

Fifth. Though she was not abandoned within a reasonable time, yet if the company undertook to repair her and failed to do so within a reasonable time, it is a constructive acceptance by the company of the abandonment. 1 Met. 160, and authori-

ties above cited. She must be repaired and returned the same vessel, and if she is of less capacity, she is not the same.

Sixth. All the questions of fact, were properly submitted to the jury; there was evidence on every point submitted, tending to prove the facts found, and in such case, their verdict will not be disturbed.

CATON, J. On the first day of April, 1850, the Lexington Fire, Life and Marine Insurance Company executed a policy of insurance on the schooner Buena Vista, valued in the policy at six thousand dollars. The risk taken on the schooner was four thousand dollars, to continue until the first day of December, 1850. On the night of the twenty-seventh of December, 1850, while upon a voyage from Buffalo to Waukegan and Chicago, with a cargo of pig iron and coal, the vessel went ashore on the point of False Presque Isle, in lake Huron, and was soon after abandoned by the captain and crew. On the twenty-sixth day of February following, Norton & Company abandoned the schooner to the underwriters, by the following notice of abandonment, which was served on Mr. Dodge, their agent:

" *To the Lexington Fire, Life and Marine Insurance Company:*

" The schooner Buena Vista, Moses W. Humphrey, Master, bound on a voyage from the port of Buffalo, in the State of New York, to the port of Waukegan, in the State of Wisconsin, and the port of Chicago, in the State of Illinois, laden with a cargo of pig iron and coal, when off or near Point Aux Barque on Lake Huron, was discovered to be in a leaky condition, on the night of the twenty-seventh day of November, eighteen hundred and fifty; the wind increased to a gale, which carried away a part of her sails and disabled her, and all efforts to clear the land proving impossible, an anchor was let go, and said schooner went ashore and stranded, with from four to five feet water in her hold, at False Presque Isle, Lake Huron. All efforts to pump her out and get her off, have proved unsuccessful. She lies hard over among the rocks and boulders, as we are informed, in an exposed condition, and will no doubt go to pieces as soon as the ice disappears in the spring.

In consequence of the disaster, the loss and breaking up of the voyage she was pursuing, the improbability of the recovery and repairing said vessel, at least at an expense not exceeding fifty per cent., and the long delay that must necessarily attend such recovery and repair, if successful, from the remote and inconvenient place where she is ashore, we are under the necessity of abandoning our interest therein to the underwriters, and you will therefore please take notice, that we accordingly abandon to you so much of said schooner as you have insured, and that we shall claim from you thereunder, a total loss. We send herewith a copy of the protest of the captain and crew of said schooner.

Very respectfully, yours, etc.,

CHICAGO, Feb. 26, 1851.                    H. NORTON & CO."

Mr. Dodge refused to accept the abandonment for the Insurance Company.

In the spring following, Mr. Dodge and Mr. Raymond, as agents of the underwriters, employed Capt. Scoville to raise and repair the vessel. He started for the wreck on the ninth of May, with one man, but he did not actually commence operations until the latter part of June. He says he found the vessel about half a mile from the harbor at False Presque Isle, and within two or three hundred feet of the shore. She was lying at her anchors, with her chains and cables slack, and heading off shore, her bow lying in about eight feet of water, and her stern in six or seven feet of water. When the sea rolled in, her bow would rise and fall a few inches, from which cause she had become weakened a few feet aft her foremast, and the plank on the bottom had become chafed and much injured. The shore where she lay was stony, mostly small stone, the largest not more than eighteen inches in diameter. The place where she lay was about two hundred and forty miles from Detroit, and about three hundred and fifty-six miles from Milwaukee. The nearest town was Mackinack, distant about seventy-four miles. One family resided on False Presque Isle, and there were a few settlers on Presque Isle proper, about seven miles distant. Beyond these, the entire country was a wilderness, and was only accessible in the winter on snow shoes.

Within less than two days after Capt. Scoville got alongside of the wreck with another vessel, he discharged her cargo and raised and towed her into the harbor, where he again sunk her in about eight feet water, till he could get means of taking her away for repairs. Capt. Scoville then went to Chicago, and procured a propeller, with which he towed the wreck to Malden, where he repaired her. He arrived with her at Malden on the twenty-eighth of June, and the repairs were completed and the vessel taken to Detroit on the seventh day of August following. The cost of the repairs amounted to between twenty-seven and twenty-eight hundred dollars. No witness states the value of the vessel after she was repaired, but it was not strenuously contended on the argument, that the repairs amounted to fifty per cent. of the value of the vessel, when repaired. Soon after the vessel arrived at Detroit, the agent of the underwriters tendered her to Norton & Company, who declined to accept her. The Insurance Company then caused her to be brought to Chicago, where she was again tendered to Norton & Company, who never received her, but gave evasive answers, and objected that her capacity to stow lumber was diminished.

Capt. Scoville says: "I consider the schooner was thoroughly repaired, with this exception, that there was a small leak in the vessel's bottom." He says he superintended the repairs, and that they were well and properly made. His last answer in his

second deposition is as follows: " I think that her hull was in a better condition before she was wrecked than after she was repaired. I think she was badly wrecked, and in order to strengthen her, we had to put additional heavy knees in the vessel's hold, which would interfere some with the stowage of freight. Her sails and rigging were better after repairing her than before she went on the beach. Being forced to leave the vessel on account of sickness, before any trial of her, I feel incompetent to say how much, if any, she was worse, after she was repaired than before she was wrecked."

In answer to the question as to what was a reasonable time to get the vessel off and repair her, Capt. Scoville says: " A reasonable time, I think, would be about six weeks. The Buena Vista was not got off and repaired as soon as she could have been. My instructions did not permit me to commence work on the vessel until some time after the ice was out, and the lake clear from it." Again, in another place, he says, partly in explanation of this: " I think the schooner Buena Vista could have been repaired in less time than she was, if we had known her precise condition, but after we ascertained it, there was no unnecessary delay. There was no place in the neighborhood of False Presque Isle, where she could have been repaired, except at an increased expense of time and money."

On the 13th of October, 1851, Norton & Company sued out an attachment againt the Insurance Company, and levied it upon the schooner Buena Vista, as the property of the underwriters, on the 14th of October, and the same day, Hixon sued out an attachment against the same defendants, which was at the same time levied on the same vessel. On the 16th day of November, 1851, Norton & Company interpleaded in the suit of Hixon against the Insurance Company, claiming that the vessel was theirs, and not the property of the Insurance Company, at the time the attachment was issued and levied upon her. Thus, it will be seen, that Norton & Company in this controversy have assumed the position ordinarily occupied by the underwriters in contests of this nature, and that Hixon occupies the position ordinarily occupied by the assured.

Of the instructions asked for by the claimants, the court refused to give the following: " If the jury believe from the evidence, that after the notice of abandonment was given, the vessel was hauled out, and repaired and returned, and offered to the claimants, that then, there was no valid abandonment, and Norton & Company are entitled to recover.

Second. " That under the policy of insurance, in this case, no valid abandonment could be made until it should be ascer-

tained that the recovery and repair of the schooner was impracticable.

Third. " If the jury believe from the evidence, that the recovery and repair of the schooner was practicable, then Norton & Company could not legally abandon her, and the verdict should be for the claimant, Norton & Company."

Exceptions were taken to the refusal of the court to give these instructions.

At the request of Hixon, the court instructed the jury as follows: " If the jury believe from the evidence, that the capacity of the Buena Vista was materially lessened by the repairs of the Insurance Company, then Norton & Company were not bound to receive her back, if she had been previously rightfully abandoned by Norton & Company, under the terms of the policy.

Second. " If the jury shall believe from the evidence, that the Buena Vista was wrecked on the 27th of November, 1851, and that to all human appearances, all reasonable efforts would have proved unavailing to get her off and repair her, and the Insurance Company did not, within a reasonable time thereafter, repair her so that she was of substantially the same capacity and goodness as she was before she was wrecked, and that Norton & Company, within a reasonable time abandoned her to the Company, the law is for Hixon.

Third. " If the jury shall believe from the evidence, that the Buena Vista was wrecked at the time and under the circumstances stated by Norton & Company in their abandonment, and shall further believe, that under the circumstances in which said vessel was wrecked, all reasonable and practicable efforts were made by the captain and servants of Norton & Company, without effect, and the voyage was broken up, and that Norton & Company abandoned within a reasonable time, and that she was not properly repaired and returned within a reasonable time to Norton & Company, then the law is for Hixon in the issue."

To the giving of these instructions, Norton & Company excepted.

The court also gave the jury the following instructions: " If the jury believe from the evidence, that the schooner Buena Vista was driven ashore, as stated in the affidavit of Rogers, and that the Lexington Fire, Life and Marine Insurance Company, within a reasonable time after, under all the circumstances, repaired the vessel, so that the vessel was substantially as good as she was before she was driven ashore, and was within a reasonable time after being so repaired, tendered by the said

DECEMBER TERM, 1854. 245

Norton et al. *v.* The Lexington Fire, Life and Marine Ins. Co.

Insurance Company to the claimants, Norton, Walter & Rogers, the law is for Norton, Walter & Rogers."

Second. " If the jury believe from the evidence, that the schooner Buena Vista was driven ashore, as stated in the affidavit of Rogers, and that the vessel was not repaired so as to be substantially as good as she was before she was driven ashore, within a reasonable time, under the circumstances, or was not tendered to the claimants within a reasonable time after she was repaired, and that Norton, Walter & Rogers did abandon the vessel to the Lexington Fire, Life and Marine Insurance Company within a reasonable time after they had notice of her condition, the law is for Hixon."

To the giving of these instructions, the claimants also excepted.

The jury returned a verdict that the vessel was the property of the Insurance Company, on the day of the levy of the attachment. The claimants filed a motion for a new trial, which was overruled by the court, to which an exception was also taken.

By this record several important questions are presented, as connected with the law of marine insurance, upon which this court has not hitherto been called to pass. The first is, to determine when the assured may abandon as for a total loss by the common law, and how far that right is modified or affected by the terms of this policy.

The assured may not only claim for a total loss of the vessel insured when the vessel has been actually destroyed, as by the wreck and breaking up of the ship, or entirely lost to the owner as in consequence of capture by an enemy and condemnation, so that there is no chance of recapture, but he may also claim as for a technical total loss, where the vessel is so much damaged by any of the perils insured against, that the damage amounts to one-half the value of the vessel, or, in other words, when the cost of getting her off and repairing her, amounts to fifty per cent. of the value of the vessel after she is repaired. These principles are recognized by all courts, but some diversity of opinion exists as to the application of them in particular cases. In order to entitle the assured to recover for a technical total loss, where the thing still remains in specie, the owner must, within a reasonable time after he is informed of the disaster, formally abandon to the underwriter, the thing insured, advising him of the facts of the disaster, so far as known, and the situation of the property. If this abandonment is accepted by the underwriter, the title to the property is at once changed to the insurer, and he is liable upon his policy precisely the same as if the thing were actually destroyed. If, however, he

declines to accept the abandonment, the question arises whether such a state of things existed at the time when the abandonment was made, as authorized the owner to abandon, and if that was the case, then the title to the thing actually passed to the underwriter, even against his will, and his liability as well as his title, is the same as if he had accepted the abandonment. In the English courts of admiralty it is held, that although an abandonment may be rightfully made at the time, so as to pass the title to the underwriter and render him liable as for a total loss, yet subsequent events may so change the rights of the parties as to defeat an abandonment rightfully made, and limit the liability to a partial loss instead of a total one; as, for instance, suppose the vessel at the moment of abandonment has been captured by and is in the hands of an enemy, if she is subsequently recaptured and restored to the owner within a reasonable time, his right to recover as for a total loss, is by such subsequent event defeated. This principle, however, has never met with the sanction of any court in this country, either State or federal, but is repudiated by all, as being unsound in principle, and leaving the rights of the parties too indefinite and uncertain. In this country it is universally held, that if the state of facts at the time of the abandonment be such as to justify it, the rights of the parties are thereby fixed in law, and that no subsequent event can render ineffectual an abandonment which was at the time rightful. It is admitted everywhere that an abandonment rightfully made, transfers the title to the underwriter at the moment. As a consequence of this it is immediately liable for his debts, and may be seized upon an execution against him, and thus the title be again transferred by operation of the law and its agents. Property thus liable to legal process ought to be fixed and certain. It is right that the assured should know with certainty what his rights are, and that when his claim has once become fixed to a legal demand for money, he may make his calculations upon that state of affairs, and not be liable to have such legal claim for money defeated by a subsequent tender of the property insured. We recognize this as the well-settled principle of law in this country.

The greatest difficulty has been to ascertain when it is that the party has a right to abandon, as for a technical total loss. All agree that the facts as they exist at the moment of abandonment, must determine the right to abandon, and that the right to abandon arises when the cost of getting off the vessel and repairing her, will amount to more than fifty per cent. of the value of the vessel when she is repaired, and yet this latter fact can never be known with absolute certainty till the vessel is got off and repaired; while the law also requires that the abandon-

ment shall be made within a reasonable time after the owner is advised of the disaster, so that the underwriter may take possession of the wreck and save as much of it as he can. Hence, from this rule, and the reason upon which it is founded, the owner shall not wait until the vessel is got off and repaired before he exercises his right of abandonment. To do so would defeat the very object of the abandonment, so far as the underwriter is concerned, which is, to enable him to take possession and save as much of the wreck as possible. To do so would be an unreasonable delay, by which the right to abandonment, as for a technical total loss, would be forfeited. It would seem to follow, as an unavoidable consequence, that the right to abandon must be determined by the judgment of experts, applied to the condition of things existing at the time of abandonment. That is, when in the opinion of judicious men, skilled in the business, there is no reasonable probability that the vessel can be got off and repaired for one-half her value, the right to abandon exists : although by some fortunate and unforseen event, the vessel may be saved and repaired for less than one-half her value. It is true the case must be apparently a desperate one which will authorize an abandonment, where subsequent events show that the vessel was actually got off and repaired for less than half her value. Upon this subject the supreme court of the United States, in the case of *Brodlie* v. *Maryland Insurance Company,* 12 Peters, 378, said : "In cases where the abandonment is founded on a supposed technical total loss, by a damage or injury exceeding one-half the value of the vessel, although the facts of such damage or injury must exist at the time, yet it is necessarily open to proofs to be derived from subsequent events. Thus, for example, if the repairs, when subsequently made, clearly exceed the half value, it is plain that this affords one of the best proofs of the actual damage or injury. On the other hand, if the subsequent repairs are far below the half value, this, so far as it goes, affords an inference the other way. But it is not, and in many cases cannot be, decisive of the right to abandon. In many cases of stranding, the state of the vessel at the time may be such, from the imminency of the peril, and the apparent extent of the expense to deliver her from it, as to justify an abandonment, although by some fortunate occurrence she may be delivered from her peril without an actual expenditure of one-half her value after she is in safety. Under such circumstances, if, in all human probability, the expenditures which must be incurred to deliver her from her peril, are at the time, so far as reasonable calculations can be made, in the highest degree of probability, beyond half value, and if her distress and peril be such as would induce a considerate owner, unin-

sured, upon the spot, to withhold any attempt to get the vessel off because of such apparently great expenditures, the abandonment would doubtless be good." In Massachusetts alone, the doctrine here laid down, has been questioned. *Wood* v. *Lincoln and Kennebec Insurance Company*, 6 Mass. 479. There it was said, that after an abandonment the underwriters might offer to indemnify the owner if he would repair, and in the event of his declining to do so, might take possession of the vessel and get her off and repair her, and if this was done at less than half the value, might return her within a reasonable time, and thus defeat the abandonment. This doctrine was controverted by Mr. Justice Story, in the case of *Peele* v. *Merchants' Insurance Company*, 3 Mason, 27. After discussing the merits of the doctrine as held in Massachusetts, he says: "If the facts then present a case of extreme hazard, and of probable expense exceeding half the value of the ship, the party may abandon, although in the event it turn out that the ship is gotten off at a less expense." And in a very late case, which was decided about the time this case was argued, SPRAGUE, District Judge, says: "In the State courts of Massachusetts the doctrine is, that the underwriter may, after an abandonment, refuse to accept it, and take possession of the vessel and repair her, and if the loss is proved to be less than fifty per cent., may return her to the former owner within a reasonable time. This doctrine is peculiar to Massachusetts. I believe it is not to be found anywhere else, either in the decisions of the federal courts, or in the State courts of any other State, or in the law of England, or of the continent of Europe. But the other principle is the law of the courts of the United States and of the other States of the Union." 3 American Law Register.

There is another principle which seems to be well settled, but which may not be applicable to this case, owing to the peculiar phraseology of the policy of insurance, and that is, if after an abandonment the underwriter take possession of the vessel, although under protest, and get her off and repair her, no matter at what or how little expense, the very act of taking possession is of itself an acceptance of the abandonment. (See particularly the two last cases referred to.) The following is the clause in the policy referred to: "And in case of loss or misfortune as aforesaid, it shall be the duty of the assured, their agents or assigns, to use every practicable effort for the safeguard and recovery of the said schooner, and if recovered, to cause the same to be forthwith repaired, and in case of neglect or refusal on the part of the assured, their agents or assigns, to adopt prompt and efficient measures for the safeguard and recovery thereof, then the said insurers are hereby authorized to inter-

pose and recover the said schooner, and cause the same to be repaired for account of the assured, to the charges of which the said insurance company will contribute," etc. It seems to me that this language clearly indicates the intention of the parties to allow the underwriters to take possession of the vessel and repair her without prejudice to their right to deny the propriety of the abandonment, so that their having taken possession of and repaired the vessel, is not, in this case, conclusive evidence of an acceptance of the abandonment, as it would have been had the policy been silent on the subject.

It now becomes necessary to examine the instructions of the court, and see whether they were conformable to the law as we find it to be settled.

There can be no doubt that the court properly refused to give the first instruction asked for by the claimants. Were that instruction correct, the insurers were not bound to repair and return the vessel within a reasonable time, while it is agreed by all, that if they retained the vessel an unreasonable time, the assured were not bound to take her back.

The second and third instructions, which were refused, are to the same point, and are substantially in the language of the contract, and might, without error, have been given. The clause of the contract to which they refer, is as follows: " But in no case whatever shall the assured have the right to abandon until it shall be ascertained that the recovery and repairs of the said schooner are impracticable," etc. Now this clause of the contract cannot be understood as suspending the right to abandon absolutely, until it is actually demonstrated beyond a contingency, that the vessel could not possibly be got off and repaired, else the right to abandon could never arise until the vessel had actually gone to pieces, for, until that time, some fortunate and unexpected event might deliver her from her peril. The word *ascertained* in the contract does not mean *demonstrated.* The recovery and repair of the vessel would be ascertained to be impracticable when, in the opinion of judicious men acquainted with the subject, there was no reasonable probability that she could be got off and repaired. If the parties were not bound to wait till it was absolutely certain that the vessel could not be got off and repaired, then they were entitled to abandon. When the vessel was in such a condition that a prudent man would not venture to spend money in attempting to relieve her, although the instruction was drawn substantially in the language of the contract, yet it was the province and the duty of the court to construe and explain the meaning of the contract to the jury; it was proper to embody in the instruction such exposition, and thus vary the instruction from the language of the

contract, so as it served to explain its true meaning. The court was therefore justified in refusing the two first instructions asked by the claimants, and in giving their third, which was as follows: "That under the policy of insurance in this case, no notice of abandonment could be made until it should be, within a reasonable time, under all the circumstances, ascertained that the recovery and repair of the schooner was impracticable." Upon this branch of the instructions, we think the claimants had no cause to complain.

The next instruction, which was given for the claimants, was upon the same point as the first instruction, which was refused, and states the law correctly.

But little was said upon the propriety of the first instruction given for Hixon. If there is anything well settled in the law of insurance, it is that the owners were not bound to receive the vessel back when tendered after she was repaired, if by the repairs her capacity was materially lessened. The law requires that she should be made substantially as good as she was before the damage, and this could not be the case if her capacity was materially lessened, although she may have been as strong as formerly. It requires neither testimony nor argument to prove that the value of a vessel must essentially depend upon her capacity. A slight diminution of her capacity might not deprive the insurers of the right to return her, but a material diminution necessarily would. It was proper, therefore, for the court to refer this question of fact to the jury, which was done.

It is hardly necessary to recapitulate the two remaining instructions, which were given at the request of Hixon, which have already been copied into this opinion. They were certainly justified by the principles of law which have been already stated.

Of the instructions given to the jury it only remains to consider the two which were given by the court without the request of either party, which have already been set forth. The first of these instructions was drawn by the court upon an hypothesis favorable to the claimants, and the other favorable to Hixon, and it may be justly said that they are drawn with great fairness, and they really embody the whole law of the case in a very accurate and concise form, and were eminently calculated to enable the jury clearly and intelligibly to understand the duty which the law imposed upon them, and to arrive at a correct conclusion. Of these neither party could have the least cause of complaint.

The propriety of the verdict only remains to be considered. Is the record destitute of sufficient evidence to sustain it? The common pleas thought it was not, and we have arrived at the

same conclusion. It may be doubtful whether there was, originally, sufficient cause for abandonment, and there was certainly very great delay in serving the notice of abandonment after the owners had notice of the disaster; a delay which, under ordinary circumstances, would undoubtedly be unreasonable. It may be said, however, that this delay could work no possible wrong to the underwriters, as the vessel, during the whole time, was frozen up in the ice, and was in an inaccessible wilderness, and that it was absolutely impossible for anybody to do anything for her relief until the ice broke up in the spring, and hence this delay could have worked no possible injury to the insurers; that the notice was served in time to make every arrangement to relieve the vessel as soon as it was possible to commence operations in the spring. The reason why the law requires an early and prompt notice of abandonment, is to enable the insurers to adopt prompt measures to save the wreck, and there may be some propriety in saying that if the delay of the notice cannot tend to defeat this object, it becomes immaterial; that where the reason of the rule fails, the rule itself ceases to exist. But waiving this point, it is not to be denied that the testimony of Captain Scoville affords very strong evidence to show, not only that the vessel was not got off and repaired and returned within a reasonable time, but also, that in the course of the repairs he was obliged to introduce timbers which did materially diminish the stowage capacity of the vessel. She was probably free from ice by the first of May. She was not repaired and tendered to Norton & Company, at Chicago, her home port, till September. They were thus kept out of the use of the vessel for more than four months, while it is manifest from the testimony of Captain Scoville, that had his instructions permitted, and with proper facilities and energy, the vessel might have been repaired and returned in about half that time. If the insurers took the vessel to repair her under the clause of the policy which authorized them to do so, and failed to return her within a reasonable time, they must be held to have retained her under the abandonment. Thus retaining her is an acceptance of the abandonment, although they were not bound by the abandonment when made. *Peele* v. *Ocean Insurance Company*, 7 Pick. 259; *Reynolds* v. *Same*, 1 Metcalf, 160. Even if there had been no abandonment, and the insurers had taken possession of the vessel after she was stranded, under the clause in the policy referred to, and failed to return her properly repaired within a reasonable time, they would thereby render themselves liable as for a total loss. Upon a general verdict as this was, we can never know upon what particular point it was determined. Indeed, some of the jurors

may have found for the plaintiff for one cause, and some for another, either of which being found in his favor, would entitle him to the verdict. We think there is evidence enough to sustain the verdict upon either or both the points above suggested, laying out of view entirely the fact that Norton & Company subsequently attached the vessel, and treated her as belonging to the Insurance Company, and the question of estoppel, so much relied upon at the bar.

We are of opinion that the judgment of the common pleas should be affirmed.

*Judgment affirmed.*

DISSENTING OPINION OF SCATES, J. The doctrine of estoppels by matters *in pais*, can have no application to the present case, else it would seem to lead to, and sanction it, in every case in which the acts or admissions of the party would be admissible in evidence against him. This is too general and broad a position. There are many acts, declarations, admissions and confessions which are admissible in evidence against the party making them, but which cannot be pleaded or proved by way of estoppel, and are left at large to be weighed with other evidence. 1 Greenl. Ev. Sec. 212. And this is applied to *adjustments of a loss* on a policy of insurance, whether paid or to be paid, which were made in ignorance of material facts, and without full knowledge of all the circumstances. Ibid.; *Reyner* v. *Hall,* 4 Taunt. R. 725; *Shepherd* v. *Chewter,* 1 Campb. R. 274 and note; *Bilbie* v. *Lumley,* 2 East R. 469; *Elting* v. *Scott,* 2 John R. 157.

Nor will the fact that the statement is sworn make matters of mere evidence operate as an estoppel, however much it may add to its weight as evidence. 1 Greenl. Ev. Sec. 210; *Thomas* v. *White,* 1 Tyrwh. & Grang. R. 110.

And this is applicable even to answers in chancery. Ibid.; *Doe* v. *Steel,* 3 Camp. R. 115; 1 Stark. Ev. 333 to 338; *Studdy* v. *Saunders,* 2 Dow & Ryl. R. 347; *De Whelpdale* v. *Milburn,* 5 Price R. 485.

The affidavit for the attachment is only an admission of property in the Insurance Company, and this was as distinctly assumed and asserted by the notice of abandonment, and the refusal to receive the schooner back when tendered. I think all the evidence objected to was properly admitted in evidence, but do not think the defendent here occupied such a position as to enable him to insist upon that evidence, as estopping plaintiffs from denying property in the Insurance Companies, and asserting it to be in themselves. To have this effect there must

be some act, conduct, admission, &c., with intention to influ-
ence the conduct of another, and some act of the other, under
the facts thereby supposed to exist, by which he will be preju-
diced, if the other be allowed to gainsay the conclusion from
those acts. *Reynolds* v. *Lounsbury*, 6 Hill R. 536; *Baker* v.
*Pratt*, 15 Ill. R. 570.

Apply the rule to the case. Hixon has not shown that he
contracted this debt with the Insurance Company, or instituted
this suit in consequence, or upon the faith of Norton & Com-
pany's affidavit or statement of the ownership of this vessel
being in the Insurance Company. Having done no act, nor been
influenced to assume a position by the conduct or declaration
of plaintiffs, he has no right to insist upon this evidence as an
estoppel.

Viewing the question, therefore, in relation to ownership, as
open under the policy, I come to inquire what has been done,
and whether that ownership was thereby changed.

It is agreed that on the 27th of Nov., 1850, the schooner
belonged to plaintiffs, and it is proved she was sailing under a
time policy, and was driven ashore on False Presque Isle in
Lake Huron on that day, and was stranded, lying hard on,
among the rocks and boulders, at anchor, with four to five feet
water in her hold. This point is shown to be about two hun-
dred and forty miles from Detroit, and three hundred and
sixty-five from Milwaukee, and, I presume, could not exceed
four hundred and fifty from Chicago, where the agency of the
Insurance was located, and plaintiffs reside. At what time the
master's protest and information of the disaster was communi-
cated to plaintiffs, does not appear. They gave notice of it and
of an abandonment as of a total loss to the Insurance Company
on the 26th Feb., 1851, three months after the loss. This is
clearly too late, for any excuse presented in this record, for the
delay. The assured, on receiving intelligence of a loss, must
" make his election speedily whether he will abandon or not,"
(Park on Ins. 280) ; he must " give notice to the underwriters
within reasonable time," (*Mitchell* v. *Edie*, 1 Term R. 608) ;
" must signify his election the first opportunity." " He must
elect in the first instance : the first instance means after the
assured has had a convenient opportunity of examining into the
circumstances, to ascertain what is the degree of damage ; if
the assured had treated it as intending to pursue the adventure
after he knew the full extent of the damage, I should have
thought the abandonment too late." (Per Gibbs, Ch. J. in *Ger-
non* v. *Roy*, Ex. Ass. Co., 6 Taunt. R. 383.) " The law is that
the assured shall abandon in reasonable time, that he may not
lie by to see whether it may be more for his interest not to

abandon." (Per Ch. J. Dallas in *Hudson* v. *Harrison*, 3 B. & B. R. 106.) "What is a reasonable time within which the notice should be given, must, in every case, depend on the circumstances of that individual case." (*Read* v. *Bonham*, 3 B. & B. R. 154.) "This is a question which has not yet been reduced to such certainty as to enable the court to pronounce upon it, without the aid of a jury." (Ch. J. Marshall in *Ches. Ins. Co.* v. *Stark*, 6 Cranch R. 273.) 2 Phil. on Ins. 382-3. See *Peele et al.* v. *The Merch. Ins. Co.*, 3 Mason R. 648.

Such is the general rule. In its application to the particular case, though not so strict, it is like notice of protest on bills. If there be unnecessary delay, the presumption will arise that the assured contemplated pursuing the voyage, and he must account for and explain it. See 2 Phil. on Ins. 383 to 390.

Here is a delay of three months unexplained, and under circumstances that warrant the conclusion that they must have known of the loss within a very short time, and where the parties all lived in the same city. I am warranted from these facts to conclude that the assured delayed to speculate upon the value of the property insured.

The law of insurance is one of indemnity and not of sale. The right of abandonment, which turns a partial loss or damage, and changes the indemnity therefor, into a total loss, and thereby effects a sale to the underwriters of the property insured, is not to be favored beyond the strict rules of law, and the contract of the parties. *Bainbridge* v. *Neilson*, 10 East R. 329, 343 ; 3 Mason R. 38.

The abandonment was refused by the underwriters. The assured having lost the right of abandonment, if it were ever warranted by the facts, of which it is therefore unnecessary to inquire, it is certainly not revived by the fact of the insurers taking possession of the vessel for the purpose of repairing the damage, nor by delay in commencing or completing such repairs, nor by the insufficiency or incompleteness of those repairs ; but any or either of these can only respect the question of damages and the fullness of indemnification. If the vessel is not fully repaired, or her capacity is lessened, or her value diminished, the underwriters are liable to pay the difference.

The insurers took possession for the purpose of repairs, according to the terms of the policy. There is no provision in relation to the length of time in which repairs were to be completed. Delay might possibly raise a question as to the extent of damage resulting from the injury, but cannot create or confer a right of abandonment ; for while the policy provided that the assured, their agent or assigns, should "adopt prompt and efficient measures for the safeguard and recovery" of the vessel,

and to " cause the same to be forthwith repaired," and for neglect, authorized the insurers to " interpose and recover the said schooner, and cause the same to be repaired for account of the assured ; " it also expressly declares that, " in no case whatever shall the assured have the right to abandon, until it shall be ascertained that the recovery and repairs of said schooner are impracticable." There is no evidence of any measures taken for the recovery or repairs, by the assured, nor have they offered any evidence of the impracticability of the recovery or repairs, other than the stranding, nor what was done to ascertain these facts, unless it be that she filled, notwithstanding the efforts of the crew to pump her out. Neither stranding, filling, nor submerging, is sufficient alone, to show a wreck, a total or constructive total loss. 2 Phil. on Ins. 380 ; 6 Mass. R. 470 ; 3 Kent Com. 322, 323, 324 ; 3 Mason R. 39, 42, 43. The right to abandon, depends upon the true state of the facts at the time of abandonment ; although the existence of these facts is sometimes in part deducible from the high degree of probability of the loss from the imminency and degree of disaster and peril.

And so if the facts justify an abandonment at the time of notice given, the right becomes vested, under the American rule, and absolute ; but under the English rule, was subject to changes varying it, up to the time of action brought. 3 Kent, 321, 322 ; 3 Mas. R. 27 ; 10 East R. 329 ; 2 Phil. on Ins. 371, Sec. 8.

Testing the right by these principles, it was extremely doubtful whether the injury and peril ever justified the abandonment. But granting that they did, it was lost and waived by delay, and could not be revived by the delay and negligence of insurers in paying or repairing. We are not sitting in judgment upon the propriety and consistency of plaintiff's conduct in giving notice of abandonment, attaching and then claiming the property. The rights of the Insurance Company, in whose right it is claimed by their creditor, are involved, and should be respected. They refused to accept, repaired and tendered back the schooner, and still apparently hold her to answer that tender. In their course and conduct, nothing equivocal or inconsistent is shown.

Under all these circumstances, I am constrained to conclude that the property in the schooner is still in plaintiffs, and that the judgment ought to be reversed.