## Case No. 3,210.

COPELAND v. PHOENIX INS. CO.

SAME v. SECURITY INS. CO.

[1 Woolw. 278;[1] 2 West. Jur. 341.]

Circuit Court, D. Missouri. Oct. Term, 1868.[2]

WHEN ABANDONMENT OF ASSURED PROPERTY IS JUSTIFIED — OBLIGATIONS OF ASSURED IN CASE OF LOSS TO MAKE LOSS LIGHT — LIABLE FOR MASTER'S NEGLECT — OWNER'S NEGLIGENCE — WHAT IS NOT ABANDONMENT — EQUIVOCAL WORDS—OF REPAIRING AND TENDERING THE INSURED VESSEL—UNJUSTIFIABLE DELAY — CONDITION OF VESSELS — GROSS DEFECTS IN REPAIRS.

1. A policy of insurance on a steamboat provided that the assured should have no right of abandonment, unless the damage should amount to half the value of the vessel, as stated in the policy, which was $45,000. She was, in fact, worth only $25,000. To justify abandonment, only $2,500 could, after the injury, have remained in her.

2. The assured are required to exercise all reasonable care, skill, and diligence, to make the loss as light as possible.

3. The owner is not excused, though he give proper directions, if the master of the vessel does not observe them, and through such neglect the damages are increased. This is on the principle that the master is the owner's agent, and the latter is liable for the neglect of the former.

4. If the master does not remain in the vessel a reasonable time, to repair the injury; and constructs an imperfect bulkhead, which is not fastened to the hull, so as to exclude the water when once pumped out; and shortly afterwards, another officer raises her in a short time, by supplying the defects, the owner is held to be guilty of negligence, and has no right to abandon her to the underwriters.

5. The owner, when he heard of the accident, notified his underwriters, and said that he had telegraphed the master that if he could not raise the vessel, he should wreck her, and the underwriters answered, "All right." *Held*, not to be an abandonment by the owner, nor an acceptance of abandonment by the underwriter.

Argu. The direction of the owner to the master was an assertion of his right to control the vessel. The defendants might well infer that the owner would claim the wreck, and call for indemnity after its value should be deducted from the loss.

6. After the defendants had notice of the loss, and before they took possession to raise and repair her, fifteen days elapsed, during which time, as they knew, the machinery, &c., were being removed, all which, if she were to be repaired, would have to be replaced. *Held*, that this delay was unjustifiable.

7. When the vessel is tendered by the underwriter to the assured, she must be in such condition that the latter, when receiving her, would have full indemnity for all the injury covered by the policy.

[Cited in Northwestern Transp. Co. v. Continental Ins. Co., 24 Fed. 176.]

8. When the deficiencies are obvious, so that, to be seen, they do not need to be pointed out, and are very great as compared with the repairs actually made, it is not incumbent on the assured to point them out, in order to justify his refusal of the vessel, and to maintain his action on the policy.

[1] [Reported by James M. Woolworth, Esq., and here reprinted by permission.]
[2] [Affirmed in Phoenix Ins. Co. v. Copelin, 9 Wall. (76 U. S.) 461.]

These were actions upon policies of insurance [by John G. Copeland or Copelin]. They were, upon the stipulation of the parties, tried and determined by the court without the intervention of a jury, under section 4 of the act of March 3, 1865 (13 Stat. 501). [The actions were originally brought in the St. Louis circuit court, but were removed to this court on motion of defendants.]

The facts appear in the opinion. But in order to enable the learned reader to apprehend the questions involved in the case, before entering upon the reading of the opinion, the following brief statement is made.

The risks were upon the steamboat "Benton," engaged in trade of the Upper Missouri, running from St. Louis to Fort Benton. The policies provided that the assured should have no right to abandon her, unless the damage sustained was one half her value as stated in the policy, which was $45,000; so that, to justify an abandonment, she must have sustained damage to the amount of $22,500. She was at the time of the accident worth but $25,000.

On the 3d day of November, 1865, about sixty miles above Omaha, she was snagged and sunk. Three days afterwards, and as soon as he heard of the accident, the plaintiff notified the agents of the defendants thereof, and that he had ordered the master to wreck her, unless he could raise her, to which their only answer was, "All right." The master made an imperfect bulkhead, and did not fit it securely to the hull, so as to exclude the water when it had once been pumped out. Without much further effort to raise her, he proceeded to wreck the vessel.

On the 23d day of November, the defendants, under the terms of the policy, took possession for the purpose of raising, repairing, and tendering her to the plaintiff. In three days they had raised her. But afterwards they proceeded very slowly with the work of repairs, and did not make a tender of her to the plaintiff until May 9, 1866, too late to allow her to make a trip up the river that season. Nor was she then placed in such condition as to furnish indemnity to the plaintiff. To put her in order, $5,000 of further expenditures were necessary.

MILLER, Circuit Justice. These cases were tried to the court without a jury, and we now proceed to render our judgment.

The "Benton," the boat insured by these companies, was sunk in the Missouri river, November 3, 1865, about sixty miles above Omaha, in consequence of being struck by a snag, which made a large opening in the side of her hull. It is not controverted that the injury is one covered by the policies of the defendants.

The plaintiff claims that he notified the defendants that he abandoned the vessel there, that he had a right to do so under the

policies, and that they accepted the abandonment. The defendants deny each of these positions. They say that they took possession of the boat as she lay sunk, under the provision of the policies which authorized them to do so, for the purpose of raising and repairing her, and returning her to the plaintiff after she had been repaired. They did raise, repair, and tender her to the plaintiff, who refused to receive her.

The grounds alleged by the plaintiff for his refusal are: 1. That he having rightfully abandoned the vessel, nothing remained but for the defendant to pay the amount of the insurance. 2. That there was an unreasonable delay in repairing and returning the vessel. 3. That the repairs were insufficient.

In regard to the first of these grounds, we are of opinion that the plaintiff has established no right to abandon the vessel. The most conclusive reason for this opinion is found in the provision of the policies, that the assured shall have no right of abandonment unless the damage or injury shall amount to one half the value of the vessel as stated in the policies. The value therein stated was $45,000. In order, therefore, to authorize the plaintiff to abandon, the amount of injury sustained must be at least $22,500. The testimony is uncontradicted that the boat, when she received the injury, was worth $25,000, and no more. [The testimony of the witnesses on both sides concur in that proposition, Mr. Brown for the plaintiff, Mr. Roe for the plaintiff, and the agent or officer of the insurance company, whose business it was to inspect vessels, Capt. Atkins, who produced the record that he had overhauled her and estimated her at $25,000 a few weeks before the injury.][3] To justify an abandonment, the damage must have been such that no more than $2,500 of value was left in her. We cannot doubt that the furniture in the cabin, the boilers, engines, and other machinery capable of removal, together with the dismantled hull, were worth three times that sum.

But we should fail to do our duty as a court, if we did not say that, independently of that provision of the policy, we have come to the conclusion that there was no right of abandonment in this case. We are satisfied that Captain Yore, who had charge of the vessel, in his hurry to escape from her before navigation became impeded by ice, did not exercise that energy, diligence, and skill in his efforts to raise her, which the principle of law governing such cases requires. The testimony on the part of the plaintiff shows that he gave all proper directions to Captain Yore; and that he exercised such faithfulness and frankness as became his position towards the defendants. But the law justly regards the principal as responsible for the acts of the agent. Every principle and every analogy constitutes the master the agent of the owner under such circumstances. It is well settled that in cases of necessity happening during the voyage, the master is by law created the agent for the benefit of all concerned, and his acts done under such circumstances, in the exercise of good faith and a sound discretion, are binding upon all parties in interest. The Sarah Ann [Case No. 12,342]; New England Ins. Co. v. The Sarah Ann, 13 Pet. [38 U. S.] 387. And when the injury is so great as to justify a sale, he from necessity becomes the agent of the underwriters, as well as of the owner, to effect the sale for their benefit. Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 604. If his agency extends to a disposition of the vessel when she is injured but not destroyed, it must extend to all acts which he may do to save her from destruction. And this is the more certain when it is considered that such is his duty. He cannot abandon his vessel in time of danger so long as it is practicable for human exertion, skill, and prudence to save her from the impending peril. Even after she is stranded there is an obligation upon him to take all possible care of the cargo. The Niagara v. Cordes, 21 How. [65 U. S.] 7. Even in case of capture, the master of a neutral vessel is bound to remain with the ship until she is condemned or a recovery is hopeless. Willard v. Dorr [Case No. 17,680]. And in a proper case, after the loss or sale of the ship, he is agent to tranship the freight for the merchant. Shipton v. Thornton, 9 Adol. & E. 314; Jordan v. Warren Ins. Co. [Case No. 7,524]; Hunter v. Prinsep, 10 East, 378.

The owner of this vessel dispatched her on this long, and, as the event proved, hazardous voyage, in charge of a master of his own selection, who was vested with this large authority over her and her cargo, and who was subject to these obligations. The bare statement is enough to show an agency here which subjected the owner to a responsibility for all of the acts and negligences of the master. For the purpose of doing all that the owner ought to do to save the vessel from total loss, the master was his agent.

In an agreement of this kind, the plaintiff contracts for indemnity for, and security against, loss by any of the perils insured against. The defendant contracts to give that security, upon the condition that all practicable means be employed on the part of the insured to make such loss as light as possible. It is a contract which, by its nature, requires a faithful observance of all the obligations imposed by it upon either party.

We are satisfied that the bulkhead which was designed to cover the injured place in the hull and to exclude the water, was not constructed with the skill which Captain Yore is known to have possessed. If more time had been taken, and more care exer-

---

[3] [From 2 West. Jur. 341.]

cised 'in its construction, a bulkhead could have been made which, when once the water was all pumped out of the hold, would have kept it out. It is clearly shown that the one made here was not fitted to the bottom and side of the boat with the skill which prudent officers would, in such an emergency, have exercised. All this is conclusively established by the fact that, without difficulty or material change in her situation, the vessel was in a short time raised by Captain Mann, the agent of the defendants,. and that he exercised only such energy and skill, and employed only such means, as had been within Captain Yore's control.

We are therefore of opinion that, for want of due care, diligence, and skill in the effort to raise the vessel, the plaintiff had not entitled himself to abandon her.

We are also of the opinion that the defendants did not accept the abandonment. The evidence upon this point consists of certain conversations between the plaintiff and the agents of the defendants residing at St. Louis. When the former heard of the accident, he immediately communicated with these agents. and in one of several conversations about that time, he said to them, "I have telegraphed to Captain Yore, if he cannot raise the boat, to wreck her." To this they responded, "All right." The plaintiff claims that this was a proposition of abandonment on his part, and an acceptance on theirs. We are not able to accede to this view.

In order to constitute a valid abandonment, no particular form of words, and no writing, is necessary. But in whatever manner it is made, it ought to be explicit, and not left open as matter of inference from some equivocal acts. The abandonment, when properly made, operates as a transfer of the property to the underwriter, and gives him a title to it or what remains of it, as far as it was covered by the policy. No deed is necessary to pass the title. Columbian Ins. Co. v. Ashby, 4 Pet. [29 U. S.] 139; Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 604; Chesapeake Ins. Co. v. Stark, 6 Cranch [10 U. S.] 268. The law gives to this act in pais all the effects which the most accurately drawn assignment would accomplish. Comegys v. Vasse, 1 Pet. [26 U. S.] 193. And if the abandonment, when once made, is good, the rights of the parties are definitely fixed by it, and it is irrevocable by either party without the consent of the other. Peele v. Merchants' Co. [Case No. 10,905]. These considerations make manifest the necessity that the act operating as an abandonment should be decisive.

In this case, so far from offering to abandon even, the plaintiff asserted his right to control the vessel; and he went on to state the manner in which he proposed to do so. The defendants might well have supposed that, even if Captain Yore should wreck the vessel, the plaintiff would still claim to own the wreck, and call for indemnity for a total loss, less the value of the wreck. The course proposed by him was the only proper one for him to pursue, if he did not intend to abandon the vessel. The defendants' assent to his proposal cannot be construed into an acceptance of the abandonment, which he might or might not afterwards make.

The mere fact of submersion of the vessel does not amount to a total loss. On the high seas it affords strong prima facie evidence, but in the shallow waters of the Missouri it does not afford even a presumption. Emerig. Ins. c. 12, §§ 12, 13; Goss v. Withers, 2 Burrows, 697; Anderson v. Royal Exchange Assur. Co., 7 East, 38; Sewall v. U. S. Ins. Co., 11 Pick. 90.

The abandonment, then, by the act of the insured must therefore appear. If, when Captain Yore left the vessel, and refused to make any further effort to save her, the defendants had not interfered, but had stood upon their rights as the case then was, we should now have to ascertain the amount of injury for which the defendants, under all the circumstances, are liable. But such is not the present position of the parties. On the 20th day of the then month of November, which was about seventeen days after the accident occurred, the defendants notified the plaintiff that they should exercise the option authorized by one of the provisions of the policies, and undertake to raise and repair the boat. Accordingly, without any instructions or interference on the part of the plaintiff, they did raise, repair, and tender her to him.

We are of opinion that this is no sufficient defence to the present action, because, first, there was unjustifiable delay in repairing and tendering the vessel; secondly, the repairs were insufficient.

From the time the defendants had notice of the sinking of the boat, until they notified the plaintiff of their intention to raise her, fifteen days elapsed. During this time, as they well knew, the machinery, boilers, and engines were being removed from the vessel as a wreck, all of which, if she were to be raised. would have to be replaced at considerable expense and loss of time. Their determination should have been taken sooner. This is, however, a minor consideration. A very few days after they had determined to raise the vessel, Captain Mann was on the spot, and had her afloat. If the energy and diligence which characterized his proceedings in raising had been exhibited also in repairing her, there would have been no cause of complaint. But he seems to have supposed that when she was once afloat, his employers were safe. The most unaccountable delays occurred in replacing the machinery; no workmen were put upon her until some time in December. But two were employed upon her before she was brought to St. Louis. It was not until May 9. 1866, that she was tendered to the plaintiff at St. Louis. The actual

repairs cost only $1764.70, a sum so small as to show clearly that there was no reason for the length of time consumed in making them.

It is to be considered here that the vessel was employed by the plaintiff in the trade of the extreme upper Missouri. Unless a vessel in that trade leaves St. Louis very early in the spring, she will encounter low water. The 9th of May is too late in the season to set out upon such an enterprise. One witness says she would have been worth $5,000 more if she had been tendered so as to make a trip that year.

The general rule is, that the repairs must be made as expeditiously as possible, in order that the voyage, if it be not completed, may not be broken up. Peele v. Suffolk Ins. Co., 7 Pick. 254; Reynolds v. Ocean Ins. Co., 22 Pick. 191, 1 Metc. [Mass.] 160. And even when, by the terms of the policy, this rule is waived by the assured, still such dispatch in the prosecution of the repairs is demanded of the insurer as would restore the vessel ready for another adventure in season profitably to engage in the same. And if the insurer is guilty of unreasonable delay, he must bear the consequences.

But we attach more importance to the fact that the repairs were insufficient. The overwhelming preponderance of testimony is, that the vessel lacked $5,000 in value of the repairs necessary to indemnify the plaintiff for the injury sustained by the accident. The deficiencies in repairs, as made, are set forth in the finding of facts at the end of this opinion.

The actual repairs made upon the vessel, cost, as I have already stated, $1,764.70. The expenses of repairing and of raising her were $12,132.82. When tendered to plaintiff, she was worth $12,000. When the injury was sustained, she was worth $25,000. Under these circumstances, there can be no doubt that the repairs were insufficient to meet the obligations which the defendants had assumed under the policies. Without going into an examination of the authorities, I may state that the conditions of these policies, supported by the law, require that the vessel, when tendered, should have been in such a condition that the plaintiff, when receiving her, should have full indemnity for all the injury which was covered by the policy.

It is claimed for the defendants, however, that, conceding the insufficiency of the repairs, inasmuch as the plaintiff did not point out to them the defects, he was bound to receive the boat, make the necessary repairs, and look to a future action at law to reimburse him the expenses; at all events, that he could not recover the full value of the vessel by refusing to receive her, until he did point out the deficiencies of which he complains, and give the defendants an opportunity to supply them.

There are decisions which go so far as to say that where the defects are not great, where they are of little importance in comparison with the whole injury to the vessel, where they might have escaped the attention of the insurers while attempting in good faith to comply with the requirements of the contract, they shall not be compelled to pay as for a total loss, unless the particulars to which objection is made are pointed out to them. We have serious doubt whether the principle by the supreme court of Massachusetts (Reynolds v. Ocean Ins. Co., 22 Pick. 191, 1 Metc. [Mass.] 160; Norton v. Lexington Ins. Co., 16 Ill. 235) asserted to this extent in the cases cited to us, can be sustained as the law. But it is not necessary to overrule these decisions, for there are manifest distinctions between them and the present case. In the first place, the deficiencies here were so obvious, so necessarily within the sight and knowledge of the defendants, that they did not need to be pointed out. Secondly, the deficiencies were so very great in proportion to the repairs actually made, the former being estimated at $5000, and the latter only a little exceeding $1700, that it is absurd to say that there was any fair and honest effort to indemnify the plaintiff for his loss.

I have already stated the views of the court upon the fidelity required of both parties in these contracts of insurance, and have commented, as I thought it deserved, upon Captain Yore's failure to do all that he could to raise the vessel. And I think that, after getting her afloat, there was a like determination on the part of the defendants to do just as little as was possible, and escape the liability imposed upon them under their contract by the law. In this effort they have failed to escape that liability. We find that the plaintiff was justified in refusing to receive the vessel, and as the policies are valued policies, he is entitled to the full amount insured by each, to wit, $5000, with interest from the time the loss was fixed.

To enable the parties to have a review of this judgment in the supreme court we make the following special finding of facts:

1. There was a due execution and delivery of the policy offered in evidence by the plaintiff in evidence.

2. The boat was struck by a snag, and sunk in the Missouri river, about sixty miles above Omaha, November 3, 1865; which injury was one of the perils against which defendants insured plaintiff in said policy.

3. Under the circumstances, the plaintiff had no right to abandon the vessel as a total loss, even though he gave notice that he did so.

4. There was no acceptance by defendants of such abandonment.

5. The defendants, under the provisions of the policy, took possession of the vessel for the purpose of raising, repairing, and tendering her to the plaintiff.

6. They did raise her, proceeded to repair, and tendered her to the plaintiff at her home port, May 9, 1866.

7. The vessel was used mainly for the trade of the upper Missouri river, making trips from St. Louis to Fort Benton. She would have been worth $5000 more to her owner if tendered to him so that she could have put out on her voyage earlier in the spring. The actual tender was not made in reasonable time.

8. The repairs made were insufficient to constitute indemnity for the injury. To remedy this, additional repairs, to the value of $5,000, were requisite. There was not proper canvas or covering for the hurricane deck, nor rigging, nor ropes. The injury to and destruction of furniture were not made good. There were left in the sides of the hull, above light water-mark, cracks through which, when the vessel was loaded and sunk down to them, the hold would have filled with water. Smaller cracks were left in the deck floor. She was not painted. A cargo would have suffered injury from these defects. The repairs in all these respects, except the paint, and even a part of that, were made necessary by the accident, and were covered by the policy.

9. The plaintiff did not point out these defects to the defendants, and refused generally to receive the boat.

On these facts as found, the court renders judgment for the plaintiff for the amount insured in the policy.

Judgment for plaintiff.

Affirmed in supreme court, Dec. term, 1869. 9 Wall. [76 U. S.] 461.

[NOTE. The grounds of affirmance, as stated by Mr. Justice Strong, were that the action of the defendant amounted to a substantial recognition and acceptance of the abandonment of which it had been notified, and that by its failure to return the boat within a reasonable time the company made itself liable to pay the full amount of the policy. Phoenix Ins. Co. v. Copelin, supra.]